## SAPONE & PETRILLO, LLP

<u>MANHATTAN</u>

40 Fulton Street, 17th Floor
New York, New York 10038
Telephone: (212) 349-9000
Facsimile: (212) 349-9003
E-mail: ed@saponepetrillo.com

<u>LONG ISLAND</u>

1103 Stewart Avenue, Suite 200
Garden City, New York 11530
Telephone: (516) 678-2800
Facsimile: (516) 977-1977
E-mail: bill@saponepetrillo.com

April 12, 2023

**BY ECF**
The Honorable Valerie E. Caproni
United States District Court for the
Southern District of New York
Thurgood Marshall U.S. Courthouse
40 Foley Square
New York, NY 10007

Re:     *United States v. Brian O'Neill*
        *Docket No. 22-CR-57 (VEC)*

Dear Judge Caproni:

Defendant Brian O'Neill presents a heart-wrenching case of a fall from grace. If we were to go back 19 years and peak into the window of Brian's family home, we would witness a 30-year-old man who married Laura, a Washington, D.C. public school teacher. Together, Brian and Laura have two sons, one 15 and the other 13 years of age.

For the next three years, Laura paid for Brain to attend law school at American University where he was no more than an average student. Throughout Brian's entire life, he wasn't the most intelligent among his peers, but he studied hard and worked even harder.

In 2007, he was admitted to practice law in Maryland, and 10 years later he waived into the D.C. bar.

During the first half of his career, Brian worked at regulatory institutions such as the SEC and FINRA.  In 2017, he lived in Washington, D.C. with his family where he started a broker-dealer investment group.

The following year, he started his own law firm.   Before long, he carved out a niche practice.  Brian was the go-to-guy in the small world of future exchanges, trading platforms, equity options and trading options.  He also did outside general counsel work and chief compliance officer work.  Truth be told, he was way in over his head.  But it felt good to be relied upon by his peers, and he did. The best he could to excel.

When Brian was a small boy, he had no one upon whom to rely.  From the time he was a toddler, mom was his only parent.  She was a mail carrier for the U.S. Postal Service, and they lived pay check to pay check. Young Brian and his mother, who was in her early 20's, were poor. As far back as Brian can remember, he was left alone to care for, and to raise, himself.  He had no adult supervision throughout his childhood.  If Brian had to drive, fly or take a train, he always did so on his own.

So Brian grew up with no guidance, and he was left to figure out everything on his own. Sometimes he got things right; other times he made mistakes.  Brian constantly felt alone and with no structure.

The lack of structure Brian suffered as a child left him with the need to always be there for his wife and small boys.  Every night when Brian puts his sons to sleep, and every morning when he wakes them up to help to get them ready for virtual schooling, is a bitter sweet

experience: on the one hand, Brian is reminded of those dark days when he was forced to fend for himself; he recalls in the pit of his stomach the immense pain of fear and loneliness with no parent to protect him.  Yet, he also feels blessed by the gift of parenthood.  Brian's biggest fear is that he will be forced to one day abandon his boys.

The advisory U.S. Sentencing Guidelines in this case are not lost on him.  And not a day goes by when Brian doesn't feel the immense pain associated with the realization that he, and he alone, has placed himself in the position of maybe having to tell his boys that their father will no longer be there for them.

For years, as a young lawyer, Brian was there for his clients and he was there to help other lawyers who sought advice that would help them to help their clients.  As Brian's popularity and expertise in the law grew, so did his client base.  Things could not have been better for Brian, his wife and children; life was great until it wasn't.

In 2020 and 2021, Brian O'Neill made the worst mistake of his life when he committed the instant offenses.  And as difficult as it had been for Brian to wrap his head around the colossal misconduct in which he had engaged, on November 15, 2022, he took the best step possible: he entered Your Honor's courtroom and accepted full responsibility for having committed two counts of Wire Fraud, in violation of 18 U.S.C. §1343.

Count one charges that from August 2020 to December 3, 2021, Brian carried out a scheme to defraud a medical equipment company headquartered in Pennsylvania ("Medequa LLC") by misappropriating millions dollars of funds he had promised to hold in escrow.  Count two charges that from April 2021 to December 2021, Brian carried out a scheme to defraud a

Hong Kong-based investor ("Maso Capital Ltd.") by misappropriating millions of dollars of funds he had promised to hold in escrow.

Counts one and two are grouped pursuant to U.S.S.G. §3D1.2(d). We ask Your Honor to calculate the Guidelines as follows:

| | | |
|---|---|---|
| Base Offense Level: | 7 | |
| Loss Exceeded $3.5 Million: | 18 | |
| More Than $1 Million From Bank: | 2 | |
| Abuse of Trust: | 2 | |
| Obstruction of Justice: | 2 | |
| Timely Acceptance: | -3[1] | |
| Total: | 28 (CHC I) = 78 - 97 months of incarceration[2] | |

New U.S.S.G. §4C1.1 would provide a decrease of two levels from the offense level determined under Chapters Two and Three if the defendant meets these criteria: "(1) the defendant did not receive any criminal history points from Chapter Four, Part A; (2) the defendant did not receive an adjustment under §3A1.4 (Terrorism); (3) the defendant did not use violence or credible threats of violence in connection with the offense; (4) the offense did not result in death or serious bodily injury; (5) the instant offense of conviction is not a sex offense;

---

[1] The Government does not agree that three levels should be subtracted.  It believes that the advisory Guidelines are 108-135 months of incarceration.  I believe that the Court should subtract the three levels, because the obstruction of justice occurred <u>before</u> Brian O'Neill entered into his plea of guilty, and from the moment he pled guilty before Your Honor he has alway accepted responsibility.

[2] As to the Guidelines calculation, we stand by the Plea Agreement, which permits us to seek a 78 - 97 month sentence. Important to note, however, in the context of 18 U.S.C. §3553(a) is that on Thursday, April 6th at 4:00 p.m., following a two-hour public meeting, the United States Sentencing Commission voted unanimously to amend U.S.S.G. §4C1.1, which will reduce the Guidelines for certain defendants.

(6) the defendant did not personally cause substantial financial hardship; (7) the defendant did not possess, receive, purchase, transport, transfer, sell, or otherwise dispose of a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense; (8) the instant offense of conviction is not covered by §2H1.1 (Offenses Involving Individual Rights); (9) the defendant did not receive an adjustment under §3A1.1 (Hate Crime Motivation or Vulnerable Victim) or §3A1.5 (Serious Human Rights Offense); and (10) the defendant did not receive an adjustment under §3B1.1 (Aggravating Role) and was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848."

Brian's Guidelines at level 26 (we continue to stand by the plea agreement regarding the calculation of the Guidelines at Level 28) would be 63 - 78 months (CHC I).

In addition, the Commission amended §5C1.1 to recommend a non-custodial sentence for certain defendants.  First-time offenders with no criminal history points who meet the above factors should receive a non-incarceratory sentence.  Prior to the new amendments, to be considered for a non-custodial sentence (*Booker* variance aside), the offense had to have fallen in Zones A or B. Part B of the new amendment will amend the Commentary to §5C1.1 (Imposition of a Term of Imprisonment) as part of the Commission's implementation of 28 U.S.C. § 994(j). This directed the Commission to make sure that the Guidelines reflect that it's general purpose is to impose a non-incarceratory sentence in cases in which the defendant is a first-time offender who has not been convicted of a violent crime or an "otherwise serious offense," regardless of the zone in which the offense falls.

Part B of the amendment addresses the alternatives to a term of prison that is available to "zero-point" offenders by revising the application note in U.S.S.G. §5C1.1 that addresses non-

violent first-time offenders to focus on "zero- point" offenders. Two new provisions will be added. New Application Note 4(A) will provide that if the defendant received an adjustment under new U.S.S.G. §4C1.1 and the applicable Guidelines range is in Zone A or B of the Sentencing Table, a sentence other than a sentence of imprisonment, in accordance with subsection (b) or (c)(3), is generally appropriate. New Application Note 4(B) will provide that a departure, including a departure to a sentence other than a sentence of imprisonment, may be appropriate if the defendant received an adjustment under new §4C1.1 and the applicable Guideline range overstates the gravity of the offense, because the offense of conviction is not either a crime of violence or an otherwise serious offense. *See* U.S. SENT'G COMM'N, REVISITING STATUS POINTS (2022), *available at* https://www.ussc.gov/research/research-reports/revisiting-status-points.

The questions to consider, include: Is Brian a first-time offender? Does he have zero criminal history points? Is the crime of conviction a crime of violence?  Should he receive an adjustment under new §4C1.1? (We continue to stand by the plea agreement regarding the calculation of the Guidelines.)  Given that the answer to all of these questions is yes, then we should consider whether the applicable Guideline range overstates the gravity of the offense? The applicable Guideline range overstates the gravity of the offense if the offense of conviction is not a crime of violence or an otherwise serious offense.

Here, the offense of conviction is not a crime of violence. Therefore, the remaining question is whether the crimes of conviction, i.e. Wire Fraud, are "otherwise a serious" offenses. One view of whether or not an offense is "serious" is offered by Congress, itself, as Congress has indicated its view of "serious" as: "a crime of violence that results in serious bodily injury." *See*

28 U.S.C. § 994(i).  In addition, Congress has directed the Commission to specify a prison term for offenders with at least two prior felony convictions committed at different times, offenses constituting a pattern of criminal conduct that afforded the defendant a substantial portion of their income, defendants who with at least three others supervise racketeering conspiracies, defendants who commit a violent felony while on supervision, and large-scale narcotics offenses. *See* U.S.C. §994(j). Finally, Congress has required the Commission to specify a maximum prison term for certain third-time offenders in narcotics cases and in those involving violence.  *See* 28 U.S.C. § 994(h). None of these details apply to Brian or this case.

Further, while we, in no way, seek to minimize Brian's misconduct, and while we continue to stand by the calculation of the Guidelines in the plea agreement, in the context of §3553(a) and the parsimony clause, we ask you to consider the ABA Task Force's "Shadow Guidelines." Before turning to the Shadow Guidelines, it bears mentioning that the authors include judges, all from this Circuit, including SDNY Judge Jed Rakoff, CA2 Judge Gerald Lynch, and former EDNY Judge John Gleeson.  And EDNY Judge Eric Vitaliano, a measured jurist with a wealth of sentencing experience, in applying the Shadow Guidelines, explained in *United States v. Faibish*, 12-cr-265, [Doc. 271 at 23] (E.D.N.Y. Mar. 10, 2016), that the Guidelines "for economic crimes, in my view, [are] almost useless."   Judge Vitaliano went on to state that:

> while the current guidelines system does not provide a reasonable way to achieve the kind of sentencing objectives the guidelines are supposed to achieve, and to try to provide fair and just punishment, and not a punishment that is not disproportionate, more uniform, that the ABA task force guidelines certainly significantly move in that direction. … So based on our computations of the economic characteristic, instead of an addition of 22 levels, the ABA guideline would add 12 levels.

*Id*. at 23-24.

Other judges in this Circuit have similarly cited and relied upon the ABA Task Force's Shadow Guidelines.  For example, in *United States v. Litvak*, No. 3:13 Cr. 19 (JCH) (D. Conn.), Chief Judge Hall stated that she was in "complete agreement with the drafters of this proposal, some of whom are very highly regarded judges in this circuit, in which the drafters urge the courts not focus on things that are easily quantifiable." Sentencing Tr. at 135–36, *United States v. Litvak*, No. 3:13 Cr. 19 (JCH), ECF No. 298 (D. Conn. July 23, 2014).  Judge Hall sentenced the defendant to 24 months of incarceration whereas the Guidelines recommendation was 108–135 months.  *Id*. at 158.

Similarly, in *United States v. Rivernider*, No. 3:10 Cr. 222 (D. Conn.), Judge Robert N. Chatigny of the District of Connecticut applied the Shadow Guidelines in sentencing a defendant convicted of 18 counts of wire fraud and conspiracy to commit wire fraud.  Judge Chatigny noted that the Shadow Guidelines' calculation yielding a sentence of 144 months' of imprisonment was "preferable to" the 324–405 month calculation under the current Guidelines. Sentencing Tr. at 206, 212.

We are asking Your Honor to impose a non-Guidelines and non-incarceratory sentence so that Brian can remain at home with his wife and especially his two sons.  We firmly believe that a sentence that will satisfy the parsimony clause, that is, that's sufficient, but not greater than necessary, to achieve the objectives of 18 U.S.C. §3553(a)(2) is a sentence of:

- time-served,
- three years of supervised release,
- six months of home confinement with electronic monitoring,
- 150 hours of community service, and

- orders of forfeiture and restitution.

Brian is remorseful and accepts full responsibility for his crimes.  He allocuted in open court before Your Honor.  He swore under oath that he is:

> an attorney admitted to practice law in Maryland and D.C. Part of my practice is assisting clients engaged in business transactions.
>
> As to Count 1, wire fraud, from August 2020 to December of 2020, I caused $5.1 million to be wired to my attorney escrow account. A client of my firm asked me to allow a third party to wire the $5.1 million for me to hold. At some future date, my client and the third party were going to purchase personal protective equipment, or PPE. Subsequent to the $5.1 million being wired to my account, I wired the funds out of my account. I did this to avoid returning the money to the third party, so the third party -- at some point the third party asked me to return it to them because they had changed their mind as to the intention to purchase PPE and their intention to buy PPE. At that time the money was no longer in my account. I intentionally removed the funds from my account to avoid returning the money to the third party as they had requested. I am sorry, and I apologize for this.
>
> As to Count 2, wire fraud, from April of 2021 to September of 2021, I caused a client to wire to my attorney escrow account $3.4 million for the purpose of a future business transaction with intention and purpose -- with intention and purpose, I wired those funds, the $3.4 million, from my account to a court account, an interpleader account, to cover part of a, a $5.1 million court order related to the facts in Count 1. I knew when I wired the $3.4 million from my account that I did not have permission from my client to do so, and I apologize for this.

This misconduct is, of course, very much regrettable.  But it, in no way, is consistent with Brian's lifetime of hard work and contributions to his family, his clients, and our community.  In addition to tremendous accomplishments, Brian also had to endure massive hurdles.  *See* 18 U.S.C. §3553(a)(1)(history and characteristics).  By way of background, Brian was born in Marshalltown, Iowa.  His parents dropped out of college soon after he was born.  From the beginning of his life, it was clear that he

would face significant challenges, and dysfunction would permeate his childhood.  His parents were young and had little money.  His dad was abusive, an alcoholic and suffered from mental illness.  This is how Brian's life began.  And his circumstances would only worsen.

His parents divorced within a couple of years.  And then Brian suffered a life-altering trauma: when he was three-and-a-half, his father kidnapped him and fled the state of Iowa.  And his father forced Brian into a new life in Georgia.  This was especially traumatizing, as Brian was deeply connected to his mother.  Desperate to get her son back, his mother eventually hired a former FBI agent to find him.  Although mom desperately tried to find her son and return him to his normal life, she would not get Brian back for a year-and-a-half.

During the time that Brian was a kidnap victim living in Georgia, his father moved him around a lot, and Brian never attended school.  He didn't learn or grow academically; nor did he acclimate to his new community or develop friendships or relationships.  His memories consist of his dad excessively binge drinking beer and shooting pool.

Once back at home with his mother, Brian spent most of his time alone.  His mother had to work long hours to put food on the table and Brian had to somehow fend for himself.  When she wasn't working at the Post Office, Brian's mom was going to school at night to earn her college degree and eventually two masters degrees.  As a young child, Brian was forced to learn to cook and clean for himself and spend long swaths of time unsupervised.

Brian tried his best to eventually live a normal life.  He studied hard, and was a good student and an even better athlete.  He was active in his church and spent his summers at church camp, as a camper and then later as a counselor.

While still a senior in high school, Brian enlisted in the U.S. Marines (*see* U.S.S.G. §5H1.11)[3].  He served for five years, and was promoted to Sergeant in three years.  During this time, Brian earned meritorious accommodations.  By electing to serve our country, Brian passed up athletic scholarships and other higher education opportunities.  The years that he spent as a U.S. Marine transformed him.  Brian would live his life focused, hard-working and determined to achieve excellence in all areas of his life.

After his five years in the Marines, Brian worked at the Chicago Board of Trade.  Within six months, he became a member of the exchange and floor trader working for himself.  Recognizing that to be a successful businessman there was still much information to learn, he enrolled in a community college two years later.  He then transferred to Georgetown University.

During his senior year at Georgetown, Brian met his wife Laura.  Brian and Laura married two years later.  They attended the University of Pennsylvania together where they each earned a Master's Degree in Education.  After graduation, to give back to the community they worked as school teachers in Chicago for a year while Brian applied to law school.  The couple then moved to Washington, D.C. where Brian attended law school at American University, and Laura taught in the Washington, D.C. public high school system.

As highlighted in the Presentence Investigation Report, Brian has held the following employment positions:

---

[3] We stand by the plea agreement and do not seek a downward departure.  We, instead, ask the Court to consider this under §3553(a)(1)(history and characteristics).

- O'Neill & Partners, LLC. (law firm):
- Sports equipment business, Liquid Rugby, which is operated out of Brian's home;
- Bradley Arant (law firm);
- J.P. Morgan Asset Management;
- Senior regulatory counsel for Miami International Holdings;
- Chief counsel for the New York Stock Exchange; and
- Attorney advisor in treaty markets and broker activity for the SEC.

Most significant in Brian's life, however, is that Brian and Laura have two sons, ages 15 and 13. Sadly, both of them suffer from attention deficit hyperactivity disorder and have school accommodations. His older son's behavioral and emotional issues are so severe that he has bounced around to different schools attempting to achieve the right fit. Following the Covid-19 pandemic, the boys have not returned to school in person and instead engage in virtual instruction. The boys need a great deal of support academically, and Brian, who works from home, provides that support while his wife teaches in the classroom.

Brian prides himself on being an extraordinary father. He is dedicated to his wife and children and is present everyday with them. Despite not having a father who was a role model in his own life, and one who, instead, caused him severe trauma, Brian always has been intent upon doing everything possible to be the best father to his two sons that he can be.

Remorse and acceptance of responsibility, both felt by Brian, are important considerations as we consider general and specific deterrence. And the requested sentence certainly can provide just punishment and promote respect for the law while providing adequate general and specific deterrence.

The available empirical evidence does not support a finding that a prison sentence necessarily leads to increased deterrent effects. *See* Andrew von Hirsch et al., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) (concluding that correlations between sentence severity and crime rates ... were not sufficient to achieve statistical significance," and that !the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects."); Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006)("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects. . . . Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence.").

Studies have also demonstrated that, except for the incapacitation effect of incarceration, there is little apparent correlation between recidivism and imprisonment. *See* David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33 Criminology 587 (1995) (finding no difference in deterrence for white collar offenders between probation and imprisonment); Donald P. Green & Daniel Winik, *Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug Offenders*, 48 Criminology 357 (2010) (study of more than a thousand offenders whose sentences varied substantially in prison time and probation found that such variations "have no detectable effect on rates of re-arrest," and that "([t]hose assigned by chance to receive prison time and their counterparts who received no prison time were re-arrested at similar rates over a four-year time frame").  The requested sentence would require that Brian spend years reporting to either a U.S. Probation Officer, being subjected to strict supervision. *See United States v. Gall*,

552 U.S. 38, 48-9 (2007) (describing probation as a punishment that "severely restricts an individual"s liberty."); quoting *United States v. Knights*, 534 U.S. 112, 119 (2001) (explaining that [probationers are] subject to several standard conditions that substantially restrict their liberty."); *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987) (underscoring that [probationers] do not enjoy the absolute liberty to which every citizen is entitled").

The Sentencing Commission has similarly found that "[t]here is no correlation between recidivism and guidelines" offense level. ... While surprising at first glance, this finding should be expected. The guidelines "offense level is not intended or designed to predict recidivism." U.S. Sent'g Comm'n, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, at 15 (2004).

A more relevant predictor of recidivism is a defendant's criminal history, of which Brian has none.  Social science research indicates low recidivism rates for offenders with no prior criminal history.  In 2004, the U.S.S.C. issued a report as part of its research series on the recidivism of federal guidelines offenders entitled: *Recidivism and the "First Offender": A component of the Fifteen Year Report on the U.S. Sentencing Commission"s Legislative Mandate*, United States Sentencing Commission, May 2004. In its report, the USSC notes:

> The "first offender" philosophy in sentencing policy generally encourages lower sentences for offenders who have little or no prior criminal conduct. This philosophy, which can be derived directly from the Guidelines Chapter Four introductory commentary, postulates that first offenders are less culpable and less likely to re-offend.  As such, they are deserving of reduced punishment.

*Id*., p. 1; *see also* 28 U.S.C. § 994(j).

The USSC found that offenders with zero criminal history points have a recidivism rate of only 11.7% (compared with a recidivism rate of 22.6% for offenders with one criminal history

point, and 36.5% for offenders with two or more criminal history points). *See id*., p. 13- 14, 26.

More specifically, among the category of offenders with zero criminal history points, those

offenders who have never been arrested have the lowest recidivism rate at only 6.8% (compared

with a recidivism rate of 17.2% for offenders with a history of arrest but no conviction, and 8.8%

for offenders with a history of arrest and conviction for only !never-count" offenses specified

under U.S.S.G. §4A1.2(c)(2)). *See id*., p. 14, 26.

The U.S.S.C. notes:

> Its low recidivism rate makes first offender group A stand out. Recall
> that group A offenders have no prior criminal events, not even a prior
> arrest." *Id*., p. 14.

Prior to this case, Brian, had never been arrested. He had lived a thoroughly law-abiding

life, and thus falls within the category of defendants with the lowest rate of recidivism. He has a

history of consistent employment, and this case and his conduct demonstrates aberrant behavior.

He served our country in the military.  He suffered a horrific trauma as a child victim of

kidnapping.  Brian is an excellent husband and father, and is very active in his sons' lives.

Finally, the U.S. Probation Department and the Government, although they do not agree with my

request for a non-incarceratory sentence, each agree that Brian should receive a below-

Guidelines sentence.

According to the Government:

> That said, it is less clear that a significant a sentence is necessary
> to serve the purposes of protecting the public and deterring the
> defendant from engaging in future criminal conduct. Prior to his
> involvement in the Medequa transaction, the defendant appears to have
> lived an admirable life. He served in the military with honor, he
> obtained a graduate-level education and established a successful career
> despite a challenging upbringing, and he appears to be a devoted

husband and father. In short, the defendant's conduct in this case seems aberrant. Additionally, having pled guilty to wire fraud, the defendant's law license is almost certainly in jeopardy, and it is unlikely that clients will place such trust in him again. As a result, the defendant seems unlikely to present any serious risk to the safety of the public or to become a repeat offender.[4]

Finally, as the attached letters demonstrate, Brian is a man who possesses extraordinary qualities, and is deserving of a second chance. *See* Letters Compiled as Exhibit A.

---

[4] See Government's Sentencing Letter, filed February 21, 2023, page 6 (ECF Document 58).

<u>Conclusion</u>

We very much appreciate Your Honor's consideration of this submission, and look forward to addressing the Court in person at the sentencing proceedings.

Respectfully submitted,
*<u>Edward V. Sapone</u>*
Edward V. Sapone (ES-2553)
Sapone & Petrillo, LLP
40 Fulton Street / 17th Floor
New York, NY 10038
(O): (212) 349-9000
(E): ed@saponepetrillo.com

cc: All Government Counsel (By ECF)

17